**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

YOYA'S MARKET and
ALMA VILLEZCAS, as manager,

       Plaintiff,

v.                                     No. CV 19-910 CG/SMV

UNITED STATES OF AMERICA,

       Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

      **THIS MATTER** is before the Court on Defendant's *Motion for Summary Judgment and Memorandum in Support* (the "Motion"), (Doc. 45), filed September 16, 2021; Plaintiffs' *Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment Pursuant to FRCP R. 56* (the "Response"), (Doc. 49), filed November 5, 2021; Defendant's *Reply in Support of Motion for Summary* Judgment (the "Reply"), (Doc. 51), filed November 16, 2021; and Defendant's *Notice of Completion of Briefing*, (Doc. 52), filed November 16, 2021. The Court, having considered the parties' briefing and the law, finds that the Motion shall be **DENIED**.

    **I.**      **Background**

      This lawsuit concerns the penalty imposed by the U.S. Department of Agriculture, Food and Nutrition Service (the "Agency") to permanently disqualify Plaintiff Yoya's Market ("Yoya's") from participating as an authorized retailer in the Supplemental Nutrition Assistance Program ("SNAP") due to trafficking violations. *See* (Doc. 1 at 9); (Doc. 45 at 9); (Doc. 49 at 6). In early 2019, Yoya's appeared on the Agency's electronic alert system as having "met patterns consistent with possible EBT trafficking violations[.]" (Doc. 12-4 at 40). On February 10, 2019, an Agency contractor conducted

a store visit and determined that the rapid nature of the subject transactions indicated trafficking. *Id.* at 46. As a result, the Agency issued a Charge Letter on April 9, 2019, levying charges of trafficking, and warning that the penalty for trafficking is permanent disqualification pursuant to 7 C.F.R. § 278.6(e)(1) unless Yoya's responded within ten days requesting a civil money penalty ("CMP") and submitting substantial evidence showing compliance with 7 C.F.R. § 278.6(i). *Id.* at 66-68.

On April 11, 2019, Yoya's timely responded, admitting to trafficking and requesting a CMP in lieu of permanent disqualification. *Id.* at 80. On May 21, 2019, the Agency denied the request. *Id.* at 102. Yoya's then retained counsel and requested review by the Administrative Review Branch on May 29, 2019. (Doc. 12-5 at 1). Yoya's provided a supplemental response on August 12, 2019, in support of its request for a CMP. *Id.* at 9. On August 21, 2019, the Agency issued its final decision, affirming the imposition of permanent disqualification. *Id.* at 28.

On September 27, 2019, Plaintiffs filed a complaint (the "Complaint") in this Court, seeking judicial review of the Agency decision under 7 U.S.C. § 2023. (Doc. 1 at 2). In the Complaint, Plaintiffs claim that the penalty imposed was arbitrary and capricious because they "have clearly demonstrated their entitlement to a civil monetary penalty in lieu of disqualification[.]" *Id.* at 9. Plaintiffs contend that permanently suspending them from SNAP "would present a hardship for the community." *Id.* at 9. Plaintiffs ask that the Court "either: find no sanction appropriate, but direct issuance of a written warning; or reduce the disqualification to a reasonable civil money penalty." *Id.* at 10.

On September 16, 2021, Defendant filed the instant Motion, asking the Court to enter summary judgment against Plaintiffs, affirming the Agency's permanent disqualification decision and dismissing Plaintiffs' case with prejudice. *See* (Doc. 45). Defendant alleges that Plaintiffs "did not present substantial evidence of an effective compliance policy and program to the Agency," either in the underlying administrative action or during discovery in the instant case. *Id.* at 1-2. Defendant therefore contends that the Agency's decision was not arbitrary or capricious, and that it is entitled to summary judgment. *Id.* at 2.

Plaintiffs contend they timely requested a CMP and have submitted "evidence including statements, affidavits, written policy documentation, and documentation of employee training in support of its request for a CMP," demonstrating their eligibility for a CMP. (Doc. 49 at 4). Plaintiffs allege there are thus disputed issues of material fact sufficient to proceed to trial. *Id.*

## II.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it could affect the outcome of the lawsuit. *Smothers v. Solvay Chems.*, *Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citation omitted). A dispute over a material fact is "genuine" if the evidence presented could allow a rational jury to find in favor of the non-moving party. *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000) (internal citation omitted). "Genuine factual issues must exist that 'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Harapat v. Vigil*, 676 F. Supp.

2d 1250, 1258-59 (D.N.M. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

A party seeking summary judgment bears the initial burden of showing there is no genuine dispute as to any material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If the party seeking summary judgment satisfies its burden, the burden then shifts to the nonmovant. *Id.* The nonmovant cannot rest on the pleadings but must "designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citation omitted). Specifically, the nonmovant must identify facts from which a rational trier of fact could find in the nonmovant's favor, utilizing evidence such as affidavits, deposition transcripts, or incorporated exhibits. *Adler*, 144 F.3d at 671. The party cannot rest on ignorance of the facts, speculation, or unsubstantiated conclusory allegations. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003).

Under Federal Rule of Civil Procedure 56(c), "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically-stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P.

56(c)(2). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"The mere existence of a scintilla of evidence will not avoid summary judgment." *Harapat*, 676 F. Supp. 2d at 1259 (citing *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993)). If the evidence in favor of the nonmovant "is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." *Id.* (quoting *Anderson*, 477 U.S. at 249). "A fact is 'disputed' in a summary-judgment proceeding only if there is contrary evidence or other sufficient reason to disbelieve it; a simple denial, much less an assertion of ignorance, does not suffice." *Grynberg v. Total S.A.*, 538 F.3d 1336, 1345 (10th Cir. 2008) (citing FED. R. CIV. P. 56(e)). The court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in their favor. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007).

## III.   Material Facts

In its Motion, Defendant sets forth fifty-five paragraphs of "Undisputed Material Facts," in accordance with D.N.M. LR-Civ. 56.1(b). (Doc. 45 at 5-14). Plaintiffs respond to each fact, disputing eleven facts by number in accordance with D.N.M. LR-Civ. 56.1(b). (Doc. 49 at 4-8). Plaintiff does not set forth any additional facts. *Id.*

### A.   *Uncontested Material Facts*

Plaintiff Yoya's Market ("Yoya's") is a convenience store located in Deming, New Mexico, managed by Plaintiff Alma Villezcas. (Doc. 45 at 5). As manager, Ms. Villezcas was responsible for bookkeeping and personnel matters, and managing all store employees. *Id.*

*i.   Prior to the Trafficking Violations*

In 2012, Salvador Gutierrez, one of the two owners of Yoya's, signed an application for Yoya's to become a SNAP retailer, thereby certifying that he agreed to comply with all statutory and regulatory requirements. *Id.* In particular, Mr. Gutierrez agreed to "accept responsibility on behalf of the firm" for violations of SNAP regulations by any employees, including trafficking. *Id.* at 6. Ms. Villezcas then put up SNAP informational posters she had received from USDA. *Id.*

At that time, Yoya's had a compliance policy and training program, which purported to prevent abuses and violations of SNAP regulations. *Id.* Yoya's no longer has that version of the compliance and training in its possession. *Id.* The compliance policy detailed how to retrieve the official USDA training materials, as well as other materials, which all employees were required to review. *Id.*

In 2018, Yoya's had only one terminal that could accept a SNAP Electronic Benefits Transfer ("EBT") card. *Id.* at 7. A cashier had to manually enter the price of SNAP-eligible items, and the EBT terminal would electronically transfer funds from the customer's EBT card to Yoya's bank account, which was controlled by the store's owners, Gloria Gutierrez and Salvador Gutierrez (the "Owners"). *Id.* at 1, 7. This terminal allowed cashiers to enter any amount, and improperly retrieve cash from the register to give to the customer. *Id.* at 7.

In 2018, most transactions at the store were electronic, meaning each cash register held only $200 at the start of a shift. *Id.* It would thus have been unusual for as much as $100 or $150 in cash to be removed from the register during a shift. *Id.* At that time, as the store's manager, Ms. Villezcas would conduct daily cash register

reconciliations, but did not closely monitor whether any cash was missing from the register. *Id.* at 8. Additionally, if a cashier took out $50 to trade for SNAP benefits, Ms. Villezcas "counted as cash" the receipt printed from the EBT terminal, since she knew the Owners were "going to be getting those $50 from the EBT deposits" in their account.[1] *Id.* Yoya's conducted store inventory only once a year, and during this inventory staff did not reconcile actual sales to sales reported. *Id.*

### ii.   The Trafficking Violations and Initial Investigation

Between April 2018 and November 2018, there was a series of irregular SNAP transaction patterns. *Id.* at 9. These patterns included "(1) multiple transactions from one or more SNAP households within a short time frame of less than two minutes . . . (2) multiple transactions from the same SNAP household within a short time frame, including as many as nine transactions within ten minutes . . . and (3) transactions that were large—as much as $170—based on the store's characteristics and food stock." *Id.* There were, for example, large purchases by the same household within minutes of each other, with transactions constituting even amounts such as $100, even though prices at Yoya's do not generally end in even numbers. *Id.*

In 2018, Yoya's appeared on the "Anti-Fraud Locator" for having met transaction patterns consistent with SNAP trafficking. *Id.* at 8. The Agency conducted an

---

[1] There are several different types of transactions that the Agency considers trafficking. It is trafficking, for example, if a customer purports to purchase a qualifying food item, but then instead of actually providing the food, the cashier takes cash out of the register in the amount of that item and splits the cash with the customer. 7 CFR § 271.2 - Definitions. It would also be considered trafficking for a cashier to manually enter a transaction, e.g., $2 for a loaf of bread, and then give the customer cash from the register in lieu of the bread. In both of these examples, the EBT debit card would transfer the funds to the store account, leaving the store whole or potentially even profiting from the transaction as the store could re-sell the untouched merchandise a second time.

investigation, analyzing Plaintiffs' EBT SNAP transaction data for April 2018 through November 2018, and sent a contractor to visit the store on February 10, 2019. *Id.* The Agency Investigative Analysis Branch concluded there were "clear and repetitive patterns of unusual, irregular, and inexplicable SNAP activity, which would warrant issuance of a trafficking charge letter." *Id.* at 8-9. The Agency duly issued such a letter dated April 9, 2019, stating that the penalty for trafficking is permanent disqualification pursuant to 7 C.F.R. § 278.6(e)(1) unless Yoya's responded within ten days of receipt "requesting a civil money penalty and submitting substantial evidence showing compliance with 7 C.F.R. § 278.6(i)." *Id.* at 9.

Yoya's suspected that the trafficking violations were committed by three former employees, who had already been terminated for stealing, and timely requested a CMP in lieu of permanent disqualification. *Id.* at 9-10. The Owners did not contest the allegations of trafficking, instead admitting in their response that they had little control over the EBT machine and that their employees had the "liberty to misuse" the machine at will. *Id.* at 10. The Owners informed the Agency that they had identified the employees they believed were responsible, and promised to improve the store's compliance. *Id.*

### iii.  Administrative Review and the Instant Case

On May 21, 2019, the Agency issued a "Determination Letter," permanently disqualifying Yoya's from accepting SNAP, *id.* at 11, for failure to submit sufficient evidence to demonstrate that Yoya's had established and implemented an effective compliance policy and program to prevent violations of the Supplemental Nutrition Assistance Program, (Doc. 12-5 at 67). That same month, Yoya's stopped accepting

SNAP and posted notices that it was no longer accepting EBT. (Doc. 45 at 11). Around the same time, Yoya's requested administrative review of the Agency's decision, and on August 12, 2019, it submitted additional documents including a signed statement from Ms. Villezcas describing the SNAP training provided at Yoya's, signed statements from current Yoya's employees, photographs of the SNAP posters posted inside Yoya's, and an additional copy of documents that had been submitted with the earlier response. *Id.* at 12.

On August 21, 2019, the Agency issued a Final Agency Decision finding that it had properly imposed a permanent disqualification, and that a CMP was not warranted in this case because the documents submitted did not constitute substantial evidence of a compliance policy in operation prior to the trafficking violations. *Id.* at 12-13. In particular, the Final Agency Decision noted that Ms. Villezcas's statement consisted of two sentences describing in "very general terms" Yoya's training program, and did not "document a policy to terminate employees who violated SNAP rules and regulations" or a "policy of corrective action following complaints against employees" or any "internal review of employee compliance" with SNAP regulations. *Id.* It stated that the contractor's photos from its February 10, 2019 visit did not reveal any SNAP posters on display that day, and that it therefore appeared such posters were only recently affixed. *Id.*

The Final Agency Decision also indicated that the August 5, 2014 training memorandum submitted by Yoya's "mostly deals with an employee training on the new alcohol ID function of the store's point-of-device" and there is "only a single handwritten notation that says 'SNAP processes, policies, be aware.'" *Id.* The Final Agency Decision

finally stated that Yoya's "did not provide contemporaneous documentation of the participation of the violating employee(s) in initial and any follow-up training held prior to the violation(s)." *Id.* (emphasis omitted).

Plaintiffs filed their Complaint in this Court on September 27, 2019, alleging that the permanent disqualification imposed by the Agency was arbitrary and capricious, and that they had previously demonstrated their entitlement to a CMP in lieu of permanent disqualification. *Id.*; *see* (Doc. 1).

### B. *Disputed Material Facts*

#### i. *Monitoring of Employees*

Defendant alleges there were two cash registers at Yoya's, and two cashiers assigned to work the register during each shift. Defendant contends that at the time of the trafficking violations, "[d]ue to lax password controls for the registers and a lack of surveillance cameras covering the counter area, the store could not be certain which cashier was responsible for any particular transaction." (Doc. 45 at 5). Plaintiffs have offered two different responses to this allegation. In their Response, Plaintiffs state they are "usually able to discern which employee processes a specific transaction," and were only unable to do so here "due to the amount of time that passed between the alleged violations and Defendant's notifying Plaintiffs." (Doc. 49 at 5). In their initial response to the Charge Letter, however, Plaintiffs stated that "[e]ven though[] we have surveillance cameras, [we] could not detect what transactions are being done" and that the Owners had "little control over [the] machine[.]" (Doc. 12-4 at 80).

### ii.  Existence of a Compliance Policy

Defendant contends that Yoya's compliance policy and training program were "documented at an unknown point" but that Ms. Villezcas "recalled reading the document out loud to employees in 2018." (Doc. 45 at 6). Plaintiffs dispute this "to the extent that [Yoya's] had documentation of its program and policies prior to 2018," but acknowledges that it cannot provide a copy due to the "trashing" of the laptop which contained the file. (Doc. 49 at 5). It is thus disputed whether Plaintiffs had an effective compliance policy and training program prior to the trafficking violations but undisputed that Plaintiffs cannot provide documentation of such a compliance policy and training program.

### iii.  Existence of Disciplinary Procedures

Defendant contends that Ms. Villezcas "only recently" added the section of the Yoya's compliance policy and training program on "employee disciplinary procedures and a list of updated SNAP regulations." (Doc. 45 at 6). Plaintiffs state that "the employee disciplinary provisions have been in full force and effect since Plaintiffs became authorized as a SNAP retailer in early 2012," and they rely on testimonial evidence for this contention. (Doc. 49 at 5).

### iv.  Providing Written Material to Employees

Defendant alleges that Ms. Villezcas "did not provide hard copies of any materials" to employees, but that during onboarding she instead told new employees where they could find online SNAP materials from the Agency "such as training videos and manuals." (Doc. 45 at 7). Defendant contends that although Ms. Villezcas provided time for new employees to look at these materials, she failed to verify that they had in

fact reviewed the materials. *Id.* Plaintiffs indicate they "ensured that each employee was provided with and reviewed copies of SNAP training and compliance materials." (Doc. 49 at 5).

> ### v.  SNAP Meetings Twice a Year

Defendant contends that Yoya's had meetings twice a year to refresh employees on store policies, and admits that "SNAP was a topic at these meetings," but alleges that trafficking was "not always discussed." (Doc. 45 at 7). Plaintiffs contend that each of their semiannual training sessions included training on SNAP. (Doc. 49 at 5). Plaintiffs do not, however, allege that trafficking was specifically discussed. *Id.*

> ### vi.  Records of Training Meetings

Defendant alleges that Plaintiffs' usual practice is to have an agenda for these meetings, but that Plaintiffs could locate only one of these agendas from a 2014 meeting, and that Yoya's did not keep records of the dates when past meetings occurred. (Doc. 45 at 7). Plaintiffs contend that they do keep records of the semiannual meetings, but state that they cannot locate said records and "believe them to have been inadvertently destroyed." (Doc. 49 at 5). It is thus disputed that Plaintiffs keep such records but undisputed that Plaintiffs are not able to provide any additional agendas or other documentation of past training meetings.

> ### vii.  Existence of Other Training Records

Defendant alleges that Yoya's "acknowledges that it has no additional training records beyond what it submitted to the Agency and did not keep records of when any training occurred." (Doc. 45 at 12). It further contends that the records provided were not contemporaneous, and that "no training records exist for the employees allegedly

responsible for the trafficking." *Id.* Plaintiffs state that they "did keep records of training, however said records have been lost and/or destroyed prior to Defendant issuing its Charge Letter to Plaintiffs in 2019." (Doc. 49 at 7).

viii.   *SNAP Posters*

Defendant contends that the Agency contractor who visited the store on February 10, 2019, took "numerous pictures of the store, including the counter areas with the two cash registers and the store's sole EBT terminal," and that Yoya's acknowledges these photos "are a fair and accurate representation of the store" at the time they were taken. (Doc. 45 at 8). Plaintiffs explain that while the photos "are a fair and accurate representation of the Market as viewed in those photos," the photos "are not a complete comprehensive representation of the Market[.]" (Doc. 49 at 6).

ix.   *Accuracy of Store Records*

Defendant alleges that Yoya's acknowledged its payroll records "were not accurate because employees did not always clock in, and the cash register records were not accurate because cashiers could log in using co-workers' passwords." (Doc. 45 at 10). Plaintiffs state that their "records are accurate and allowed management to determine who was working at a given time." (Doc. 49 at 6).

x.   *Plaintiffs' Investigation of Trafficking*

Defendant contends that Yoya's "did not conduct an investigation or interview employees to determine whether any of the other cashiers could have been responsible for the trafficking." (Doc. 45 at 10). Plaintiffs allege that they "conducted a limited investigation" and used logic and basic reasoning to determine the offending employees. (Doc. 49 at 6).

xi.    *Evidence of SNAP Training Program*

Defendant alleges that the only evidence Plaintiffs provided in support of their

SNAP training program was "(1) a letter dated August 5, 2014 reminding store

employees to enter birthdates for customers purchasing alcohol, signed by two out of

the three purportedly offending employees because one had not yet been hired, (2) an

undated 'Meeting Outline' listing 'SNAP — process, policies, be aware' as a topic, and

(3) a list [] showing the names of 18 store employees updated in August 2014." (Doc. 45

at 10-11) (citations omitted). Plaintiffs state that they have provided "statements, training

logs and compliance policy and training program documentation to Defendant." (Doc. 49

at 7).

xii.    *Timing of Plaintiffs' Providing the Policy to the Agency*

Defendant contends that in its April 11, 2019 response to the Charge Letter

"Yoya's Market did not . . . provide its compliance policy because it believed what it had

submitted was sufficient." (Doc. 45 at 10-11). Plaintiffs dispute this to the extent that

they have provided the documentation to Defendant during discovery in the instant

case. (Doc. 49 at 7).

IV.    **Analysis**

In the Motion, Defendant asks the Court to affirm the Agency's decision to

permanently disqualify Yoya's from the SNAP program, in lieu of imposing a CMP, on

the grounds that Plaintiffs failed to present substantial evidence of an effective

compliance policy during either the underlying administrative proceeding or the instant

proceeding. (Doc. 45 at 1-2). Plaintiffs contend that they have presented substantial

evidence of such a policy, and thus that there remain disputed issues of material fact. (Doc. 49 at 4).

### A. _Legal Standard Governing Agency's Decision to Impose a Civil Monetary Penalty_

The Agency may impose a CMP on a business engaged in trafficking SNAP benefits instead of the harsher sanction of permanent disqualification from the SNAP program if the business establishes by substantial evidence that (1) it had developed an effective compliance policy, (2) the business's compliance policy and program were in operation prior to the violation, (3) it had developed an effective training program, and (4) the owners and managers were not aware of, were not involved in, and did not benefit from, the trafficking violations. 7 C.F.R. §§ 278.6(b)(2)(ii)-(iii), 278.6(i). Substantial evidence is "more than a mere scintilla[]" of evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." _Biestek v. Berryhill_, 139 S. Ct. 1148 (2019). Even where these standards are satisfied, the Agency retains the discretion to impose permanent disqualification rather than a CMP.[2] 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6. Generally, permanent disqualification is the penalty for trafficking SNAP, even for a first-time offense. 7 U.S.C. § 2021(b)(3)(B); _see also Three Friends, Inc. v. United States_, No. CV ELH-20-2649, 2021 WL 5841474, at *12 (D. Md. Dec. 9, 2021) ("Permanent disqualification is the presumptive sanction where a retailer has trafficked in SNAP benefits."). This harsh

---

[2] Violation of a business's SNAP regulation may result in fines, temporary disqualification, or permanent disqualification. _See, e.g._, _Phany Poeng v. United States_, 167 F. Supp. 2d 1136, 1138 (S.D. Cal. 2001) (Agency imposed a six-month disqualification where store clerks wrongfully accepted ineligible items, such as dishwashing liquid); 7 U.S.C.A. § 2021(b). However, when a business commits trafficking, the only penalties provided by statute are permanent disqualification or a civil monetary penalty. 7 C.F.R. § 278.6 (i).

disqualification scheme is designed to encourage robust preventative policies, such that "innocent store owners whose stores lack such a policy remain subject to permanent disqualification." *Kim v. United States*, 212 F.3d 1269, 1273 (9th Cir. 1997).

A business that is aggrieved by the Agency's decision to choose disqualification as the penalty instead of the imposition of a CMP may seek federal review of the Agency's decision. 7 U.S.C. § 2023(a)(13). "The suit in the United States district court . . . shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action." 7 U.S.C. § 2023(a)(15). "A trial de novo is a trial which is not limited to the administrative record—the plaintiff may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency." *Kim*, 121 F.3d at 1272 (citation and internal quotation marks omitted). "The trial de novo provision of the Act 'is clearly broader than the review standard provided for under the Administrative Procedure Act. It requires the district court to examine the entire range of issues raised, and not merely to determine whether the administrative findings are supported by substantial evidence.'" *Affum v. United States*, 566 F.3d 1150, 1160 (D.C. Cir. 2009) (citation and internal quotation marks omitted). This includes cases where the decision challenged is the choice of sanction. *See id.* at 1160.

Where a business challenges the Agency's decision to disqualify it from the SNAP program in lieu of imposing a CMP, the trial court must still conduct a de novo review as required by § 2023 (a)(15) to determine the facts on which the sanction was predicated. *Affum*, 556 F. 3d at 1161. "However, the terms of the Act indicate that a trial court may only overturn the agency's choice of penalty if, on the de novo factual record,

it is determined that the Secretary *abused his discretion* in declining to impose a [CMP] in lieu of disqualification." *Id.* (emphasis added). The regulations thus afford a plaintiff "the opportunity to make anew their case regarding their eligibility for a CMP." *Yoya's Mkt. v. United States*, 511 F. Supp. 3d 1211, 1216–17 (D.N.M. 2021).

While the Court may thus review new evidence in considering whether the sanction imposed was valid, consistent with the de novo standard, judicial review of the sanction selected is limited to whether the Agency's choice was arbitrary and capricious. *Affum*, 566 F.3d at 1161; *see also Four Winds Behavioral Health v. United States*, No. CV 19-212 SCY/LF, 2021 WL 2821094, at *10 (D.N.M. July 7, 2021) ("Despite review of the disqualification decision being de novo, the agency's choice of sanctions is subject to arbitrary and capricious review."), *appeal filed*, No. 21-2089 (10th Cir. Aug. 2, 2021); *Country Club Food Mkt. v. United States*, No. 15 CV 07-972 RB/DJS, 2008 WL 11451519, at *4 (D.N.M. May 23, 2008) ("Courts interpret this standard as requiring de novo review of violation findings, yet requiring only an arbitrary and capricious review of the discretionary selection of a sanction."). A penalty is arbitrary and capricious if it "is unwarranted in law or without justification in fact." *Haskell v. U.S. Dep't of Agric.*, 930 F.2d 816, 820 (10th Cir. 1991) (quoting *Joudeh v. United States*, 783 F.2d 176, 178 (10th Cir. 1986)). "[T]he views of the Secretary as to the appropriate sanction in a given case of violation are entitled to very great, if not conclusive, weight." *Cross v. United States*, 512 F.2d 1212, 1218 (4th Cir. 1975).

Despite the de novo standard of review, summary judgment may be granted in a case contesting permanent SNAP disqualification. *See, e.g.*, *A to Z Gas & Food, Inc. v. Perdue*, No. CV 19-12911, 2021 WL 1600038, at *5 (E.D. Mich. Apr. 23, 2021) (granting

summary judgment for the Agency where plaintiff failed to contest that trafficking violations took place, request a CMP, or oppose the motion). That is, the trial de novo provision of 7 U.S.C. § 2023(a)(13) does not entitle a plaintiff to a full trial on the merits in lieu of summary judgment. *Mahmood v. United States*, No. CIV.A. WMN-12-0228, 2012 WL 3038638, at *2 (D. Md. July 24, 2012). Where there are no genuine issues of material fact, summary judgment is a proper means of disposing of a request for review under 7 U.S.C. § 2023(a)(13). *Id.* (quoting *Bon Supermarket & Deli v. United States*, 87 F. Supp. 2d 593, 599 (E.D. Va. 2000)); *see also Brother Convenience Store, Inc.*, 2021 WL 3911594, at *8; *7-Eleven, Inc.*, 2016 WL 5107129, at *1-4; *Three Friends, Inc. v. United States*, No. CV ELH-20-2649, 2021 WL 5841474, at *12 (D. Md. Dec. 9, 2021). This includes a determination of whether the choice of penalty by the Agency is arbitrary or capricious. *Three Friends*, 2021 WL 5841474, at *12.

As a final note, the Court has found only one relevant Tenth Circuit case reviewing the imposition of permanent disqualification in lieu of a CMP. *See Haskell v. U.S. Dep't of Agric.*, 930 F.2d 816, 820 (10th Cir. 1991) (affirming permanent disqualification where plaintiff submitted no evidence of a compliance policy). The issue proved novel within this District, as well. *But see Four Winds Behav. Health*, 2020 WL 4001998 (denying summary judgment to government where the underlying trafficking was disputed); *Country Club Food Mkt.*, 2008 WL 11451519 (analyzing a six-month disqualification for non-trafficking regulatory violation). Thus, this Memorandum Opinion and Order analyzes the issue largely against what other Circuits and Districts have done. *See*, *e.g.*, *Lane v. Page*, 581 F. Supp. 2d 1094, 1107 (D.N.M. 2008) (looking to other Circuits in the absence of Tenth Circuit authority).

**B.  <u>Whether Defendant Has Demonstrated Yoya's was Ineligible for a CMP</u>**

In view of the foregoing legal standards, the question before the Court is whether Defendant has shown there is no genuine dispute that its decision to permanently disqualify Yoya's from the SNAP program was not arbitrary and capricious. FED. R. CIV. P. 56(a); *Haskell*, 930 F.2d at 820 (quoting *Joudeh*, 783 F.2d at 178). Put differently, the question is whether there is a genuine dispute that Plaintiffs have failed to provide substantial evidence, in either the proceeding below or in the instant action, that satisfied all four criteria for CMP eligibility under the regulation. 7 C.F.R. §§ 278.6(b)(2)(ii)-(iii), 278.6(i).

Defendant argues that, in both the underlying administrative proceedings and in the instant case, Plaintiffs have presented "only minimal evidence" that they had an effective compliance policy predating the violations, or that they developed and instituted an effective personnel training program. (Doc. 45 at 17, 20). Defendant also contends that trafficking would have been "plainly evident" to both Yoya's manager, Ms. Villezcas, and the Owners, at the time of the violations, and that thus both the management and ownership of Yoya's were aware of the trafficking. *Id.* at 22.

Plaintiffs, meanwhile, urge the Court to consider "the documentary evidence of Plaintiffs' training program and its compliance policy, coupled with the declarations and additional documentation provided herein, along with Plaintiffs' lengthy spotless record as a participant as a SNAP retailer." (Doc. 49 at 27). Plaintiffs further argue that there is no evidence that the management or ownership were in any way involved in or aware of the trafficking, and that even if they had been, Yoya's would still qualify for a CMP as it would be the first occasion of such awareness or involvement. *Id.* at 25.

The Court will first consider criteria one and two together—whether Plaintiffs provided substantial evidence of an effective compliance policy and whether such a policy was in effect prior to the violations—which appears to be the central dispute. Then the Court will turn to criteria three and four, whether Plaintiffs provided substantial evidence of an effective personnel training program, and whether the Owners and managers were aware of, were involved in, or benefited from trafficking.

> i.   *Whether Yoya's Provided Substantial Evidence of an Effective Compliance Policy in Operation Prior to the Violations*

The parties agree that prior to the violations, Yoya's had a compliance policy which purported to prevent abuses and violations of SNAP regulations. (Doc. 45 at 6). However, Defendant disputes that the policy was effective. *Id.* at 6. Defendant argues that the "undisputed evidence shows that the store's SNAP training program consisted of telling new employees to watch videos without any effort to ensure they actually did so[,] or testing for comprehension." (Doc. 51 at 1). Defendant also contends that "store management was aware of large amounts of missing cash from the registers corresponding with EBT receipts." *Id.* Plaintiffs, meanwhile, argue that Ms. Villezcas required all employees to review "*and warrant* that they fully understand Plaintiffs' compliance policy and training program *prior to* their first shift." (Doc. 49 at 20) (emphasis in original). Plaintiffs further contend that they have "denied repeatedly that management or ownership was involved" in trafficking. *Id.* at 25.

"[I]n determining whether a firm has established an effective policy to prevent violations, [the Agency] shall consider written and dated statements of firm policy which reflect a commitment to ensure that the firm is operated in a manner consistent with" the

regulations. 7 C.F.R. § 278.6(i)(1). "Although the regulatory criteria for proving an

effective compliance policy and program appear[] to favor written documentary evidence

of the compliance policies, the regulations allow other types of evidentiary submissions."

*Castillo v. United States*, 989 F. Supp. 413, 417 (D. Conn. 1997). That is, the

regulations allow the Agency to consider:

> (i)    Documentation reflecting the development and/or operation of a policy to terminate the employment of any firm employee found violating [the] regulations;
>
> (ii)   Documentation of the development and/or continued operation of firm policy and procedures resulting in appropriate corrective action following complaints of [the] violations or irregularities committed by firm personnel;
>
> (iii)  Documentation of the development and/or continued operation of procedures for internal review of firm employees' compliance with [the] regulations;
>
> (iv)   The nature and scope of the violations charged against the firm;
>
> (v)    Any record of previous firm violations under the same ownership or management; and
>
> (vi)   *Any other information the firm may present to [the Agency] for consideration.*

7 C.F.R. §§ 278.6(i)(1)(i)-(vi) (emphasis added); *see also Castillo*, 989 F. Supp. at 416;

*7-Eleven #22360 v. United States*, — F. Supp. 3d —, 2021 WL 4264824 (D. Md. Sept.

17, 2021).

During discovery in this case, Plaintiffs provided "the 'Compliance Program'

handbook and . . . a USDA SNAP Training Guide for Retailers" as proof of an effective

compliance policy, both of which postdate the trafficking violations. (Doc. 45 at 13-14);

*see also* 7 C.F.R. §§ 278.6(b)(2)(ii)-(iii), 278.6(i). In her deposition, Ms. Villezcas

conceded that the old compliance policy no longer exists, explaining that she saved

over the old document. (Doc. 49-2 at 43-44). Ms. Villezcas further alleged, however,

that the old policy was "substantially similar" to the "Compliance Program" handbook

and "USDA SNAP Training Guide for Retailers" provided during discovery. *Id.*; *see*

(Doc. 45 at 13-14). Importantly, the Court can find no dispute from Defendant that the Compliance Program handbook in the record is substantially similar to the policy in effect prior to the violations. *See* (Doc. 45); (Doc. 51).

Plaintiffs' "Compliance Program" handbook specifically exhorts employees not to "give cash in exchange or refund for SNAP benefits (i.e. trafficking)." (Doc. 49-3 at 3). The compliance policy provides that upon a violation of SNAP rules and regulations, an employee will be "suspended from work and must undergo SNAP retraining PRIOR to working [his or her] next shift." *Id*. at 6. It further provides that "[e]mployees who engage in fraud or other misconduct are subject to disciplinary action," and that this disciplinary action includes mandatory retraining for the first offense, and immediate termination for the second offense. *Id.* at 4-5.

Plaintiffs also provided, at the administrative level, four photos showing "Using SNAP Benefits" posters hanging on the walls of Yoya's;. (Doc. 1-2 at 16-19); *see* 7 C.F.R. §§ 278.6(i)(1)(ii)-(iii) (Agency may consider documentation of firm policy and internal procedures). Ms. Villezcas, in her deposition, indicated that she hung these posters in 2012, when the store first started accepting SNAP. (Doc. 49-2 at 21). That would have predated the trafficking violations at issue in this case by some six years. Defendant disputes this, alleging that its contractor took photos on February 10, 2019, which showed no "Using SNAP Benefits" posters on display. (Doc. 12-5 at 30). It would be inappropriate for the Court to make a credibility determination at the summary judgment stage. *Fogarty v. Gallegos*, 523 F.3d 1147, 1166 (10th Cir. 2008) ("the court may not grant summary judgment based on its own perception that one witness is more credible than another"). There is thus a genuine dispute about whether these posters

hung on the walls prior to the violations, and therefore whether the Agency should have credited this in its decision.

Additionally, Plaintiffs rely on statements made in letters submitted by the Owners and Ms. Villezcas to the Agency in the underlying administrative proceeding, the deposition of Ms. Villezcas, and the Declaration of Ms. Villezcas. (Doc. 49-2); (Doc. 1-2 at 6). In explaining the purported effectiveness of the policy, Ms. Villezcas stated in her deposition that prior to the trafficking violations, each new employee was provided with and reviewed copies of SNAP training and compliance materials. (Doc. 49-2 at 21). However, in explaining her own involvement in ensuring compliance, she admitted that when she noticed cash missing from the register, she did not count it if she saw a receipt printed from the EBT terminal. *Id.* at 10. Ms. Villezcas stated that she did not notice the trafficking was taking place because she was overworked and "wasn't paying attention." *Id.* at 18.

The Owners likewise acknowledged that some dishonest employees "had the liberty to misuse [the EBT terminal] as they wished," that "[e]ven though[] we have surveillance cameras, [we] could not detect what transactions are being done" and that the Owners had "little control over [the] machine." (Doc. 12-4 at 80). They explain that although they "are usually able to discern which employee processes a specific transaction, [] due to the amount of time that passed between the alleged violations and Defendant's notifying Plaintiffs, said employees could not be conclusively determined." (Doc. 49 at 5).

Plaintiffs state that, as soon as the Agency informed them of suspected trafficking, they "conducted a limited investigation and using logic and basic reasoning,

determined that the three offending employees were the same that were caught stealing from Plaintiffs." *Id.* at 6. Ms. Villezcas's deposition testimony is consistent with this. She stated that, after the Agency had alerted the store of suspected trafficking by employees, her supervisors asked her to find out who had committed trafficking, and that at the time she believed that it was several employees who had recently been terminated for unrelated stealing. (Doc. 49-2 at 14). She stated that the reason she knew they were involved in trafficking was that "they were working at those dates and at that time, and they were always having all these friends coming over," and also because they had been caught stealing. *Id*. Additionally, Ms. Villezcas stated in her Declaration that after becoming aware of the violations, she retrained her remaining cashiers on SNAP policies. (Doc. 49-2 at 15).

To the extent Defendant is arguing Ms. Villezcas admitted she was aware of trafficking, yet decided to do nothing about it, and thus the compliance policy was ineffective, the Court disagrees. *See* (Doc. 45 at 22). It is true, as Defendant states and Ms. Villezcas agrees, that a cash register "would have been short of cash when trafficking occurred[.]" (Doc. 45 at 22); *see also* (Doc. 49-2 at 17-18). That, however, does not necessarily lead to the conclusion that Ms. Villezcas knew of the trafficking because the missing cash "would have been plainly evident to [her] when she conducted her register reconciliations[.]" (Doc. 45 at 22). Rather, Ms. Villezcas testified in her deposition that she had no knowledge of the trafficking violations until Yoya's received the Charge Letter. (Doc. 49-2 at 13). Thus, this fact is genuinely disputed.

Defendant further urges the Court to disregard Ms. Villezcas's Declaration, contending Plaintiffs have offered it in an effort to create a "sham issue of fact by

contradicting prior deposition testimony[.]" (Doc. 51 at 2). Specifically, they argue Ms. Villezcas, who was the store's manager at the time, was unable to even determine which cashier handled a particular transaction, much less detect trafficking. *Id*. Upon review of the relevant statements, the Court disagrees that they are contradictory.

Ms. Villezcas stated in her Declaration that, based on her "intimate knowledge of the [store's] operations and transactions . . . [she] and the [store] are usually able to discern which employee processes a specific transaction." (Doc. 49-1 at 1). She further explained, in discussing the particular employees she later believed to be responsible for the trafficking, that "a review of pertinent records indicate[s] that [the stealing employees] were the ones responsible for the conduct described in the Charge Letter." (Doc. 49-1 at 4). On the other hand, in her deposition, she responded to the question, "Is there any way to tell which cashier handled a particular transaction?" by saying, "No, it's hard to tell," and agreed that prior to 2019 she was unable to figure out which particular cashier handled a particular transaction. *Id*. It is unclear to the Court whether, in her deposition statement, she was describing her in-the-moment ability to make such a determination as opposed to her ability, after the fact, to do so. If it were the latter, her statements would be consistent. The Court cannot make that determination at this stage.

In sum, while Plaintiffs have failed to offer a dated written policy in existence at the time of the violations, they have offered other evidence by way of written policies postdating the violations, as well as testimonial evidence of the policy's efficacy and existence prior to the violations. Viewing this evidence in the light most favorable to Plaintiffs, a genuine dispute exists as to whether Plaintiffs have failed to offer substantial

evidence of an effective policy that predated the violations. *See Biestek*, 139 S. Ct. at 1148 (substantial evidence is "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."); *see also*, *e.g.*, *Shreegi Enterprises, Inc. v. United States*, No. 1:CV-15-2232, 2018 WL 1919576, at *30 (M.D. Pa. Apr. 24, 2018) (finding four-page manual with one-page SNAP training sufficient to raise issue of material fact regarding the compliance policy).

ii.    *Whether Yoya's Provided Substantial Evidence of an Effective Training Program*

In order to survive summary judgment, Plaintiffs must also show that there is a genuine dispute as to the regulation's two remaining criteria. 7 C.F.R. §§ 278.6(b)(2)(ii)-(iii), 278.6(i). As to the third criterion, training, Defendant notes that while Plaintiffs have eleven employees, (Doc. 12-4 at 80), only five employees, including Ms. Villezcas, signed statements listing dates of trainings, (Doc. 1-2 at 6-15). Defendant argues it is therefore "apparent that the onboarding training conducted by Yoya's Market did not consistently occur as intended," and that Plaintiffs' evidence "does not reflect an effective personnel training program." (Doc. 45 at 20-21). Defendant also disputes the effectiveness of any individual training sessions that did take place, alleging that Plaintiffs told their employees where to find materials about SNAP, and provided them time to look at the materials, but were not able to provide any evidence documenting that their employees actually did so. *Id*. at 20.

Plaintiffs argue that Ms. Villezcas's testimony that all employees are required to "review *and warrant* that they fully understand Plaintiffs' compliance policy and training program," among other statements, constitutes substantial evidence of a "compliance policy that has been the product of both a hybrid of verbal and written policies." *Id*. at

20-21. Plaintiffs argue that "[t]he standards are forgiving, and allow for a variety of evidence to demonstrate that a training program was in place prior to the violations." *Id.* at 24. Plaintiffs contend that they have met this flexible standard, and have thus "conclusively establishe[d] the existence of the compliance/training program and policies prior to the alleged violations, as required by the regulations," or at the very least, shown a dispute of material fact exists. *Id.* at 25.

Courts may find a training program effective if it includes use of online tutorials, use of the USDA SNAP Retailer Guide, warnings on display in the business regarding SNAP rules, and employee acknowledgement forms showing initial trainings and retraining after violations. *7-Eleven #22360*, 2021 WL 4264824, at *6. Evidence of informal ongoing training and random spot-checks are also favorable to a finding that a training program is effective. *See id.*, at *8; *see also Ahmed*, 47 F. Supp. 2d at 397; *Castillo*, 989 F. Supp. at 418.

As stated above, Plaintiffs provided a USDA SNAP Training Guide for Retailers which, although postdating the trafficking violations, was similar to the USDA training manual that was read aloud at trainings prior to the violations in 2018. (Doc. 45 at 13-14); (Doc. 45-1 at 15). In Plaintiffs' Administrative Review Submission, they provided a letter from Ms. Villezcas describing the Yoya's SNAP training program for new employees, five one-page statements from current employees on their past SNAP trainings including one from Ms. Villezcas, and a meeting agenda from 2014 stating "SNAP—processes, policies, be aware." (Doc. 1-2 at 6-15). The one-page statements gave information on the employees' start dates and training dates, including one who stated they had received training within one month of their hire date. *See* (Doc. 45 at

21); (Doc. 49-2 at 36 and 37). These one-page statements listed times when employees had viewed SNAP videos or attended meetings or trainings on "all SNAP regulations" or "EBT" generally, including any "refresher" sessions. (Doc. 1-2 at 8-12).

While only five of Plaintiffs' eleven employees, including Ms. Villezcas, signed statements listing dates of trainings, (Doc. 1-2 at 6-15), Plaintiffs maintain that employees were all trained *prior* to starting work, (Doc. 49 at 20). Additionally, the Court notes that Plaintiffs report having six cashiers, meaning that nearly every cashier appears to have submitted a statement. *See* (Doc. 12-4 at 80). Ms. Villezcas stated in her Declaration that "it is [Yoya's] policy that all new employees must review all necessary materials when they are hired, [] in addition to no less than semi-annual sessions held as refreshers." (Doc. 49-1 at 2). She further stated that "[a]s part of any new employee training, we have [new employees] take nearly a week to learn how to properly use the SNAP machines and process SNAP transactions." *Id.* at 3. She stated that "[b]efore they are even allowed to work their first shift post-training, we make sure and confirm with them that they have read and reviewed our compliance policy and training program documentation, as well as having reviewed the pertinent SNAP regulations, training videos, and other necessary documents." *Id.*

This is consistent with Ms. Villezcas's letter to the Administrative Review Branch, in which she stated that the hiring process begins with training, including online SNAP videos, policies and regulations, as well as reviewing a list of products that can be purchased with food stamps. (Doc. 1-2 at 6). In Ms. Villezcas's deposition, she similarly reported that she "confirm[ed] with every employee prior to allowing them to work a shift . . . that they have reviewed . . . [the] Compliance Training Program and Guide and that

they fully understand the rules and regulations applicable to SNAP." (Doc. 49-2 at 44). It thus appears that there may be extensive orientation training that takes place in addition to post-hire refresher sessions, but that only the latter is formally documented. *See* (Doc. 1-2 at 6-15); (Doc. 49 at 20).

Additionally, Ms. Villezcas stated in her deposition that after receiving the Charge Letter, she reviewed the processes of using SNAP with all the cashiers. (Doc. 49-2 at 15). She testified that at that time, her remaining cashiers were well-informed as to the requirements of SNAP. *Id*. This testimony regarding orientation training and periodic retraining, together with the presence of informational SNAP posters on the walls, is evidence of the type of training programs courts have found appropriate for small businesses such as Yoya's. *See, e.g.*, *7-Eleven #22360*, 2021 WL 4264824, at *6; *Ahmed*, 47 F. Supp. 2d at 397; *Castillo*, 989 F. Supp. at 418. Plaintiffs have therefore raised a disputed issue of material fact as to whether they provided substantial evidence of an effective training program in effect prior to the violations.

   iii. *Whether the Owners Were Aware of, Were Involved In, or Benefited from the Trafficking Violations*

As to the fourth criterion, whether the owners and managers were aware of, were involved in or benefited from the trafficking, Defendant argues that trafficking would have been "plainly evident" to Ms. Villezcas during her daily register reconciliations, as well as to the Owners, who controlled the store's bank account at the time of the violations. (Doc. 45 at 22). Plaintiffs, meanwhile, contend that neither the store's management nor its Owners were in any way involved in or aware of the trafficking, and that, in the alternative, even if they had been, Yoya's would still qualify for a CMP as it would have been the first occasion of such awareness or involvement. (Doc. 49 at 25).

29

A store may be permanently disqualified for trafficking violations, even when the owner was innocent of, and did not benefit from, the violations. *See Main & Champ Food & Deli, Inc. v. U.S. Sec'y of Agric.*, No. 2:10-CV-00145, 2011 WL 3739050, at *5 (S.D. Ohio Aug. 24, 2011) (upholding disqualification where trafficking violations were committed by prospective buyer temporarily operating the business). "The innocence of the store owner is relevant only to determine which sanction shall be imposed—a civil penalty or disqualification—not whether a sanction shall be imposed." *Bakal Bros. v. United States*, 105 F.3d 1085, 1088 (6th Cir. 1997). It is unclear, however, whether control of a bank account suffices to show the requisite control or benefit. *Compare Main & Champ Food & Deli*, 2011 WL 3739050 (finding no dispute that owner was involved even where a separate bank account was used for trafficking), *with Shreegi Enter., Inc.*, 2018 WL 1919576, at *16 (finding no involvement where trafficker used the regular store bank account).

As the Agency states in its internal "Retailer Reply and Case Sanction Recommendation," modern registers annotate credit sales versus cash sales, meaning large sums of cash would have been missing at the time of the violations. (Doc. 12-4 at 92); *see also* (Doc. 12-5 7577) (showing 51 total flagged transactions totaling over $3,000). However, while Defendant implies that Ms. Villezcas therefore must have known trafficking was taking place and decided to do nothing, she has in fact consistently maintained that she was simply "not paying attention," and that she first learned of the violations via the Charge Letter. *See* (Doc. 1-2 at 6); (Doc. 49-2 at 18). In particular, she testified in her deposition that she did not know trafficking was taking place prior to receiving the Charge Letter, and that upon learning of the violations she

conducted an investigation to determine that the offending employees had already been terminated, and took remedial action by retraining her remaining cashiers. (Doc. 49-2 at 14-15). Ms. Villezcas's consistent deposition testimony and sworn Declaration thus show a disputed issue of material fact as to whether Yoya's management and Owners were aware of the trafficking violations when they took place.

The Court therefore finds that there is a genuine dispute as to whether Plaintiffs have provided substantial evidence that satisfied all four criteria for CMP eligibility under the regulation. 7 C.F.R. §§ 278.6(b)(2)(ii)-(iii), 278.6(i).

**V.    Conclusion**

For the foregoing reasons, the Court finds that Defendant's *Motion for Summary Judgment and Memorandum in Support*, (Doc. 45), shall be **DENIED.**

**IT IS SO ORDERED.**

_____
THE HONORABLE CARMEN E. GARZA
CHIEF UNITED STATES MAGISTRATE JUDGE